VAN GILDER, Special Administratrix, Appellant, vs. CITY OF MADISON, Respondent.

*March 5—June 22, 1936.*

For the appellant there was a brief by *Darrell MacIntyre,* attorney, and *Lester C. Lee* of counsel, both of Madison, and oral argument by *Mr. Lee.*

*Francis Lamb,* city attorney, for the respondent.

The following opinion was filed April 28, 1936:

ROSENBERRY, C. J. It is the contention of the plaintiff that the ordinance adopted January 4, 1933, was invalid be-

cause the council had before it no "recommendation" of the board of police and fire commissioners. This contention is based largely upon the proposition that in the communication made on behalf of the board by its president to the mayor the word "suggested" was used instead of "recommended." Without attempting to draw any fine distinction between the dictionary definitions of these words, it is apparent that the statement made by the police and fire commission was intended as a compliance with the provisions of the statute with respect to the reduction of salaries of policemen. A recommendation is little more than a suggestion, and it is held that the communication discloses a substantial compliance with the statute.

A more difficult question is presented by the contention made on behalf of the defendant city that sec. 62.13 (7), Stats., provides merely for a recommendation in order that there may be a decrease in the salaries fixed by the council, and that the police and fire commission has no authority to limit the amount of the diminution in salaries, but having recommended a specified decrease in salaries, the council may diminish the salaries in any amount it chooses without regard to the attempted limitation made by the police and fire commission. The language of the section is:

"Such salaries when so fixed may be increased but not decreased by the council without a previous recommendation of the board."

Having in mind the end to be achieved by this section, which is to lodge a degree of control over the police and fire departments and so prevent the disorganization and deterioration of the departments, it is considered that the police and fire commission has power to recommend or suggest the amount of the proposed decrease in salaries, and while the council is not required to decrease the salary as much as recommended by the fire and police commission, it may not

exceed the amount of the decrease so recommended. Upon the notice of review made by the defendant, so much of the judgment as awards compensation at the rate found for the months of January, February, and March is affirmed.

It is next contended on behalf of the plaintiff that the control of the police department, including the amount of salaries to be paid to policemen, is a matter of state-wide concern, and under the provisions of the home-rule amendment the common council had no power to withdraw the city of Madison from the operation of that section.

This contention presents a difficult question and one of major importance to every city in the state of Wisconsin as well as to the state at large. A proper disposition of the matter requires us to consider somewhat extensively the history of the home-rule amendment, the state of the law at the time of its adoption, and the ends sought to be achieved thereby, in order that we may arrive 'at a correct conclusion. The matter presented is difficult because of the use of language in the home-rule amendment which so far as we are able to ascertain has not been judicially construed, and because of the fact that the functions of state and local governments necessarily overlap. The matter of home rule has been a subject of debate and controversy in this state for more than a quarter of a century. A larger measure of control by cities over their local affairs was sought to be achieved by an act of the legislature, ch. 476, Laws of 1911. Briefly this act provided that a city might by a charter convention alter or amend its charter. This was held in *State ex rel. Mueller v. Thompson* (1912), 149 Wis. 488, 137 N. W. 20, to be an unlawful delegation of legislative power. Mr. Justice TIMLIN, concurring in the decision of the court, reviews at considerable length the history of home rule in this country, and we need do no more than refer to the very exhaustive opinion written by him upon this subject. It may be due to the fact that he

so severely criticized the use of the words "municipal affairs" that words of like import were not used in the constitutional amendment ultimately proposed and in 1924 adopted.

In the consideration of this matter we have consciously attempted to free our minds of any predilection or preconceived ideas with respect to the merits of home rule for cities, as opposed to rule under charters granted by the legislature, and shall endeavor to arrive at the true meaning of the amendment as adopted. The whole matter of the relation of powers granted by a home-rule amendment to the constitution of a state and the powers of state legislatures have been considered in a very exhaustive and thoughtful work, "The Law and the Practice of Municipal Home Rule," by McBain, published in 1916. At that time there were home-rule provisions in the states of California, Ohio, Washington, Oregon, Michigan, and Colorado. This work must have been very familiar to the persons who framed the home-rule amendment for submission to the people of this state. It would be impossible to set out any considerable part of the discussion, but the author there discusses (page 668) : (1) Shall the substantive powers of home rule be simply included by implication in the apparently adjective grant of power to frame a charter? (2) Shall the grant of home-rule powers be made only in general terms or shall there be a descriptive enumeration in addition to such general grant? He points out that in one form or another the question has been raised as to—

"whether the grant of home rule includes the power to regulate matters pertaining to taxation, eminent domain, police, police courts, health, education, the annexation and separation of territory, streets, the ownership of public utilities, the regulation of privately-owned public utilities, municipal elections, the presentation of claims against the city, and the grant of jurisdiction in respect to municipal affairs to courts forming a part of the regular judicial organization of the state."

In discussing the relation of the powers of cities and the powers of state legislatures, he discusses: First, Shall home-rule powers be made expressly "subject to" the other provisions of the constitution? Second, Shall the provisions of home-rule charters be made subject to "general laws?" Third, Shall home-rule charters be made subject to laws of general application to cities? He closes the discussion with the following:

"As has already been indicated, if the plan were adopted of accompanying the general grant of self-governing power with a specific enumeration of powers within what may be called the twilight zone, it would be a matter of no great difficulty, in connection with this enumeration, to set forth with fair precision the respects in which state laws should take supremacy over charter provisions. . . . It is as inexcusable in reason as it is unsatisfactory in practice that the heavy burden of developing the lines of this big problem of policy should be imposed upon the judicial branch of the government."

Vol. I, Bulletins for Constitutional Convention Mass. 1917–18, pp. 419–450, deals with the matter of home-rule amendments. In the light of these discussions to which only brief reference is possible here and the opinion of Mr. Justice TIMLIN, the home-rule amendment to the constitution of this state took this form:

"Cities and villages organized pursuant to state law are hereby empowered, to determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of state-wide concern as shall with uniformity affect every city or every village. The method of such determination shall be prescribed by the legislature." (Sec. 3, art. XI.)

The words "local affairs" had no established legal meaning. The words "municipal affairs" had been used in the state of California and had been the subject of considerable discussion and some judicial construction. Manifestly, a defi-

nition of municipal affairs would shed very little light on what was meant by local affairs. When is an enactment of the legislature of state-wide concern? We find no answer to this question in any decision of any court in this country. The legislative power in this state is lodged in the legislature. When it exerts that power it exerts it on behalf of and in the name of the people of the state of Wisconsin. A valid argument could be based upon the proposition that whenever the legislature sought in the exercise of the power thus conferred to deal with any existing situation, by that very act that matter became a matter of state-wide concern. Manifestly, however, the words "state-wide concern" could not have been used with that precise meaning because the legislature itself would under such construction have the power of whittling away the provisions of the home-rule amendment. It must be assumed that some useful purpose and proper end was sought by the adoption of the amendment.

The most difficult question presented is the meaning of the phrase "as shall with uniformity affect every city." Was it the intention of the people that the legislature should be without power to enact any law affecting a city of two thousand five hundred people unless that law at the same time affected in the same way the city of Milwaukee, a metropolitan community having few if any interests akin to those of a small city of the fourth class? What was meant by uniformity? Was the law to be uniform in its application to the city of X with two thousand five hundred population and affect it in the same way it affects the city of Milwaukee, a metropolitan community having a population of six hundred thousand? In that sense there could hardly be a law affecting with uniformity every city. A law uniform in its application might work out one way in one city and in another way in another city depending upon the local situation and the way in which it was in fact administered and so "affect" them differently.

The word "uniform" was not a new word in the law at the time the home-rule amendment was adopted. Sec. 23, art. IV, Const., provides:

"The legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable."

Under this provision of the constitution it was held that an act regulating boards of trustees having charge of charitable institutions in counties having a population of two hundred fifty thousand (Milwaukee county) did not violate this section. In other words, under this provision of the constitution counties were subject to classification. *State ex rel. Busacker v. Groth* (1907), 132 Wis. 283, 112 N. W. 431.

In *Strange v. Oconto Land Co.* (1908) 136 Wis. 516, 117 N. W. 1023, it was argued that sec. 74.60, Stats., which provided for the collection of taxes in towns which refused or failed to elect officers, was unconstitutional because it did not apply uniformly. This contention was overruled.

It was held that an act which provided that any county in the state may change the method of compensating sheriffs was not repugnant. *State ex rel. Sommer v. Erickson* (1904), 120 Wis. 435, 98 N. W. 253. Illustrations might be multiplied at great length.

Sec. 1, art. VIII, Const., provides: "The rule of taxation shall be uniform."

It was early held that under this provision of the constitution property might be exempted from taxation. Under this section of the constitution it was held that property was subject to proper classification. The cases are reviewed in *Lawrence University v. Outagamie County* (1912), 150 Wis. 244, 136 N. W. 619. The validity of legislative classification was upheld although the particular law under consideration was held invalid.

Under the constitution of this state as adopted in 1849, the legislature might enact local and special laws. The exer-

cise of this power led to such abuses that an amendment to the constitution was adopted in 1871 prohibiting the enactment of special laws for nine enumerated purposes, sec. 31, art. IV, and by amendment adopted in 1892, sub. 9 was amended to include cities so that it read:

"For incorporating any city, town or village, or to amend the charter thereof"—

and thereafter all city charters were dealt with by general law. Contemporaneously with the adoption of sec. 31, sec. 32 of art. IV, was adopted. This provided:

"The legislature shall provide general laws for the transaction of any business that may be prohibited by section 31 of this article, and all such laws shall be uniform in their operation throughout the state."

In *Johnson v. Milwaukee* (1894), 88 Wis. 383, 60 N. W. 270, it was held that a classification which conformed to certain specified requirements was valid under sec. 32. These requirements may be stated as follows: (1) All classification must be based upon substantial distinctions which make one class really different from another. (2) The classification adopted must be germane to the purpose of the law. (3) The classification must not be based upon existing circumstances only. It must not be so constituted as to preclude addition to the numbers included within a class. (4) To whatever class a law may apply, it must apply equally to each member thereof.

It is hardly necessary to point out that under the Fourteenth amendment to the constitution of the United States, which provides:

"Nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws,"—

that persons have always been held to be subject to classification upon proper grounds. While this section does not use the word "uniform" when it provides that no person shall be denied the equal protection of the laws, it provides that they

shall be treated with equality, a stronger word than uniformity. Manifestly, they are not so treated when one is put in one class and another person is put in another class and they are subjected to different rules of law; nevertheless this is held to be a proper exercise of legislative power. It was the established law at the time the home-rule amendment was adopted that "uniformity" was not inconsistent with classification.

Did the framers of the home-rule amendment and the people who adopted it mean by "every city" anything more than is meant in the Fourteenth amendment by "any person," or than what was meant in the sections of our constitution relating to uniformity of county government, uniform taxation, and uniform laws for the incorporation of cities, villages, and towns? In other words, was it intended that cities should not be subject to classification so far as the home-rule amendment affected them? It may be argued that this follows from the use of the term "every city." But sec. 23, of art. IV, Const., refers to one system of county government which shall be as nearly uniform as practicable. So also sec. 1, of art. VIII, requires the rule of taxation to be uniform. Sec. 32, of art. IV, that laws relating to the incorporation of cities, villages, towns, and other enumerated matters shall be uniform.

We should have no difficulty in reaching the conclusion that cities under the home-rule amendment are subject to classification, and that what the amendment means is that any law enacted by the legislature shall affect with uniformity every city of a class to be specified, were it not for the fact that there inheres in this construction the possibility that the legislature in the exercise of its powers might in practical·effect entirely defeat the purpose of the amendment. However, having before us the considerations enumerated by Mr. Justice Timlin and Mr. McBain, which have already

been referred to, we can reach no other conclusion than that it was the intention of the people in the adoption of the amendment to leave a large measure of control over municipal affairs with the legislature. To construe the amendment as meaning that every act of the legislature relating to cities is subject to a charter ordinance unless the act of the legislature affected with uniformity every city from the smallest to the greatest, practically destroys legislative control over municipal affairs, assuming that laws could be drawn which would meet the requirements of the amendment so construed. On the other hand, local affairs should be as was held in *State ex rel. Ekern v. Milwaukee* (1926), 190 Wis. 633, 209 N. W. 860, subject to a liberal interpretation in the interest of local self-government.

In ascertaining the meaning of the home-rule amendment we should also take into account the fact that the legislature was not hostile to a larger measure of local self-government by cities. In *State ex rel. Mueller v. Thompson, supra,* it had been held that an act of the legislature authorizing cities to alter or amend their charters or to adopt a new charter was invalid because it was an unwarranted delegation of legislative power. The cities of the state were not arrayed against the legislature with regard to the right of local self-government. After the decision in the case referred to, the only possible remedy which could be invoked which would confer any measure of home-rule powers upon municipalities was by way of amendment to the constitution of the state. This amendment took the form of a direct grant of power to the municipalities rather than an enlargement of the power of the legislature to delegate legislative functions to cities. In this connection it is also interesting to note that the act of the legislature held unconstitutional in *State ex rel. Mueller v. Thompson, supra,* employed the words "municipal affairs" instead of "local affairs." The restrictive clause was that the

municipality could not act "in its municipal affairs" in contravention of laws "operative generally throughout the state." Almost simultaneously with the adoption of the home-rule amendment the legislature adopted an act repealing all special charters and conferring upon cities "all the powers that the legislature could by any possibility confer upon it." *Hack v. Mineral Point* (1931), 203 Wis. 215, 233 N. W. 82. The enactment of this law gave to the cities all the powers conferred by the home-rule amendment. However, when a power is conferred by the home-rule amendment, it is within the protection of the constitution and cannot be withdrawn by legislative act.

One other matter should be adverted to although it is not argued in briefs of counsel. There has been a great deal of division of opinion as to whether cities have so-called inherent powers. We shall not attempt to discuss the matter at any length, but the controversy seems to have been definitely settled by decision of the supreme court of the United States. Discussing the nature of the powers conferred upon cities, the court said:

"Neither their [cities'] charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the federal constitution. The state, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. . . .

"In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state,

and the state may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will." *Trenton v. New Jersey* (1923), 262 U. S. 182, 43 Sup. Ct. 534, 536, citing *Hunter v. Pittsburgh,* 207 U. S. 161, 28 Sup. Ct. 40.

The home-rule amendment as framed imposes "the heavy burden of developing the lines of this big problem of policy upon the judicial branch of the government," which is what Mr. McBain pointed out in 1916 it should not do. So far no one has had the temerity to attempt to define local affairs. No other constitution uses the term "matters of state-wide concern." While these terms in some contexts may have a definite content as used in the constitution they are practically indefinable. The home-rule amendment certainly confers upon cities plenary powers to deal with local affairs and government subject to the limitations contained in the amendment itself and other provisions of the constitution. The powers of municipalities are subject to the limitation that the municipality cannot by its charter deal with matters which are of state-wide concern and its power to enact an organic law dealing with local affairs and government is subject to such acts of the legislature relating thereto as are of state-wide concern and affect with uniformity all cities.

The home-rule amendment does not lodge the power to determine what is a "local affair" or what is a "matter of state-wide concern" either with the municipality or with the legislature or attempt to define those terms. In the event of a controversy between municipalities and the state therefore the court is required to make the ultimate determination. In the first instance, the determination of what is a "local affair" and what is a "matter of state-wide concern" would seem to be for the legislature for the reason that such a determination must involve large considerations of public policy. Even

though the determination made by it should be held not to be absolutely controlling, nevertheless it is entitled to great weight because matters of public policy are primarily for the legislature. *Jessner v. State* (1930), 202 Wis. 184, 193, 231 N. W. 634; *Julien v. Model B., L. & I. Asso.* (1902) 116 Wis. 79, 92 N. W. 561; *Borgnis v. Falk Co.* (1911) 147 Wis. 327, 351, 133 N. W. 209; 6 R. C. L. p. 109, § 108, and cases cited.

If the legislature should go so far as to declare that which clearly constitutes "local affairs" to be matters of "state-wide concern," the act of the legislature would be subject to the limitations of the constitution although matters of public policy were involved. In this case the legislature has left no room for doubt as to its position with respect to the law under consideration. By ch. 193, Laws of 1935, the legislature declared that the provisions of sec. 62.13 and other statutory clauses included should be construed as enactments of state-wide concern "for the purpose of providing a uniform regulation of police and fire departments." While the law is not retroactive, it is a clear declaration as to what in the opinion of the legislature is a matter of "state-wide concern." This legislative declaration accords with the determination made by courts under somewhat comparable circumstances. It is possible that a different result would be reached under the provisions of the constitutions of the states of Missouri and Colorado. In those states the grant of power to municipalities is apparently much broader.

The supreme court of the United States has said with respect to the charter of the city of St. Louis that the constitution of the state of Missouri creates an *imperium in imperio*. *St. Louis v. Western Union Telegraph Co.* (1893) 149 U. S. 465, 13 Sup. Ct. 990. A grant of power of such wide extent as that contained in the constitution of the state of Missouri has been found to be embarrassing in practice and not productive of the best results. No doubt it was for

that reason that restrictions were provided in the home-rule amendment adopted in this state.

Sec. 62.13, Stats. 1933, is a part of the general charter law governing cities of the second, third, and fourth classes, which provides : "Each city shall have a board of police and fire commissioners," and prescribes the procedure to be followed by the board of police and fire commissioners. The defendant city in this case attempted to escape the restraints of sec. 62.13 by adopting the charter ordinance already referred to. If sec. 62.13 providing for a board of police and fire commissioners in cities of the second, third, and fourth classes deals with a "local affair," it was within the constitutional power of the defendant city to withdraw itself from the operation of that section. If on the other hand it deals with a matter of "state-wide concern," the defendant city had no such power because it has constitutional authority to deal only with "local affairs." So we are called upon to determine whether or not the legislature exercised its power in a matter of state-wide concern.

So far as we have been able to discover in all jurisdictions where the question has arisen because of a conflict between a charter ordinance adopted under a home-rule provision of a constitution and an act of the legislature, the matter of police and fire protection has been held to be a "matter of state-wide concern" for the following reasons stated briefly and without exposition: (1) The legislature exercises a sovereign power of the people with respect to legislation, its action in that regard being limited only by the state and federal constitutions; (2) the preservation of order, the protection of life and property, and the suppression of crime are primary functions of all civilized states; (3) municipal subdivisions of the state are merely agencies of the state in respect to the performance of these primary obligations of the state; (4) the legislature unless limited by constitutional provisions has the power to rearrange the laws by which this primary duty

is discharged as the needs of the state may require; (5) while a considerable part of the state's duty in these several respects has been delegated to municipalities, towns, villages, and counties, "enforcement of the law, the preservation of order, the protection of persons and property, and the suppression of crime" must always be matters of state-wide concern; (6) because for a long time these duties have been delegated to and performed by the various municipal subdivisions of the state, these functions are ordinarily thought of as being in part the primary duties of cities and other municipalities. However, it would be within the competency of the legislature if it so desired to entirely rearrange the law of the state with respect to these matters. It might make the police officers of the various municipalities if it so chose subject to the commands of the chief executive of the state instead of leaving that control as it now does with the chief executive officers of the various municipalities. What shall be done in these respects is wholly a matter of policy to be determined by the legislature within constitutional limitations.

The determination of other courts and a consideration of the fundamental reasons which underlie those determinations require us to hold that the preservation of order, the enforcement of law, the protection of life and property, and the suppression of crime are matters of state-wide concern. It is true that municipalities deal with many of these subjects and have done so for many decades. However, their power to deal with these matters is not derived from the home-rule amendment but from the legislature through legislative enactment. These powers so vested by the legislature in the municipalities may be withdrawn, modified, or dealt with as the public interest requires in the opinion of the legislature. Cases in other jurisdictions cannot be cited as authority for the conclusion here reached for the reason that no other jurisdiction has a home-rule provision couched in the language of

the home-rule amendment of this state. It is for that reason that we have gone into the matter in so much detail. The cases from other jurisdictions are cited in the margin for the reason that it would extend this opinion to an unwarrantable length to set out the provisions in the various home-rule jurisdictions and then analyze the cases which have arisen thereunder.[1]

On behalf of the defendant city it is contended that the regulation and maintenance of a police department pertains to local affairs and government; that in as much as sec. 62.13 (7), Stats., does not relate to a matter of state-wide concern and affects all cities with uniformity, the defendant city may by the adoption of a charter ordinance withdraw itself from the operation of that section. This contention finds some support in the decisions of this court as well as in the decisions of courts of last resort in other jurisdictions and requires us to give further consideration to what is meant by "local affairs."

---

[1] *Walton v. Donnelly* (1921), 83 Okla. 233, 201 Pac. 367, 371; *Aldrich v. City of Youngstown* (1922), 106 Ohio St. 342, 140 N. E. 164, 27 A. L. R. 1499; *Board of Health of City of Canton v. State* (1931), 40 Ohio App. 77, 178 N. E. 215; *City of Richmond v. Virginia Railway & Power Co.* (1925) 141 Va. 69, 126 S. E. 353; *City of Logansport v. Public Service Comm.* (1931) 202 Ind. 523, 177 N. E. 249, 76 A. L. R. 839; *Everill v. Swan* (1898), 17 Utah, 514, 55 Pac. 68; *Arnett v. State ex rel.* (1907) 168 Ind. 180, 80 N. E. 153; *Kansas City, Mo., v. J. I. Case Threshing Mach. Co.* (Mo. Supp. 1935) 87 S. W. (2d) 195; *Attorney General v. City of Detroit* (1923), 225 Mich. 631, 196 N. W. 391; *City and County of Denver v. Henry* (1934), 95 Colo. 582, 38 Pac. (2d) .895, see authorities cited in dissenting opinion; *Peterson v. Chicago & Alton Ry. Co.* (1915) 265 Mo. 462, 178 S. W. 182; *Silvey v. Com'rs of Montgomery County* (D. C. 1921), 273 Fed. 202; *Browne v. City of New York* (1925), 241 N. Y. 96, 149 N. E. 211; *Adler v. Deegan* (1929), 251 N. Y. 467, 167 N. E. 705; Bulletin Constitutional Conv. (Mass. 1917–18) vol. I, p. 419 Bull. 11; Dawley, Special Legislation and Municipal Home Rule in Minnesota, Recent Developments (1932); 16 Minn. Law Rev. 659; MacMillin, What Municipal Home Rule Means Today (1932), 21 National Municipal Rev. 601.

In *State ex rel. Ekern v. Milwaukee* (1926), 190 Wis. 633, 209 N. W. 860, the court had under consideration the validity of an ordinance adopted by the city of Milwaukee by which it elected that sec. 343.461, Stats. 1925, limiting the height of buildings in cities of the first class should not apply to the city of Milwaukee, and fixing a maximum height for buildings in that city higher than that prescribed in the act of the legislature. After some discussion of the effort of the people of the state to obtain uniformity in municipal government and a discussion of some of the considerations affecting the construction of the home-rule amendment, the court said:

"As applied to the situation here presented, we hold that though the height of buildings in cities is of state-wide concern under the rule heretofore recognized, that health and safety regulations are not merely for the occupants and visitors of the particular buildings but for the people of that particular community and for the community at large [citing], yet nevertheless that the height of buildings in a particular community is a problem and affair which much more intimately and directly concerns the inhabitants of that community than the casual visitor or the other parts of the state, and it is therefore a 'local affair' of such community within the amendment."

We must consider this case with that of *State ex rel. Harbach v. Mayor* (1926), 189 Wis. 84, 206 N. W. 210. In that case the court had under consideration the provisions of ch. 285, Laws of 1925. It was claimed by the mayor of the city of Milwaukee that that chapter was invalid because in conflict with the so-called home-rule amendment. Ch. 285, Laws of 1925, raised the limit of taxation for school purposes from eight tenths of one mill to one mill. It was contended that the repair of school buildings was a local affair of the city of Milwaukee; that the legislature was prohibited from legislating upon that subject except by general law which "shall with uniformity affect every city or every vil-

lage;" that in as much as ch. 285 affected only cities of the first class, it was invalid because repugnant to the home-rule amendment. The court said:

"If the field of legislation upon the subject of education belongs to the state, it belongs to it in its entirety. If the cause of education is not a subject of municipal regulation, the municipality cannot touch it or interfere with it in the slightest degree. School buildings are an essential agency in the state's educational scheme, and to allow municipalities a voice in the construction, repair, control, or management of the school buildings within their borders is to yield to them the power to frustrate the state's plan in promoting education throughout the state. If power be granted to interfere in this respect, there would be no logical limitation to municipal interference with the district schools. . . .

"It follows that the so-called home-rule amendment imposes no limitation upon the power of the legislature to deal with the subject of education, and this applies to every agency created or provided, and to every policy adopted by the legislature, having for its object the promotion of the cause of education throughout the state."

If the protection of the public health is a matter of state-wide concern and the regulation of the height of buildings in cities is a health measure, it is difficult to reconcile the two cases, and it can only be done upon the assumption that the regulation of the height of buildings has such a remote connection with public health as to make it so much more a local affair than a matter of state-wide concern that it in fact drops out of the classification of matters of state-wide concern.

In *State ex rel. Sleeman v. Baxter* (1928), 195 Wis. 437, 219 N. W. 858, further consideration was given to the matter of the conflict between the home-rule amendment and legislative enactments relating to cities. Sec. 63.15, Stats., provided for the submission to the electorate of a city of the question of whether the city should adopt a commission form of government. The mayor refused to call a special election

in accordance with the petition on the ground that the matter was within the protection of the home-rule amendment and not governed by act of the legislature. The court considered the question: Does the home-rule amendment withdraw from the government all power to enact laws relating to "local affairs" unless of state-wide concern, and shall with uniformity affect every city or every village? The court concluded:

"The power conferred upon cities is 'to determine their local affairs and government,' subject only to such 'enactments of the legislature of state-wide concern as shall with uniformity affect every city or every village.' This plainly contemplates that there will continue to be in the future as there always have been in the past enactments of the legislature affecting only classes of cities. This is a plain recognition of the continuing right of the legislature to classify cities for the purposes of legislation in accordance with settled practice. But enactments of the legislature which do not affect all cities uniformly are to be subordinate to legislation of cities within their constitutional field. When cities under their constitutional power enact legislation, that legislation supplants in that city all enactments of the legislature with which it comes in conflict unless such enactments of the legislature affect all cities with uniformity. If the state legislation affects only classes of cities, it is subordinate to the city legislation in the city which has so legislated, but it is still in force and effect for the government of cities which have not acted under their home-rule powers."

In determining just what was held by the court it must be borne in mind that the court was considering the power of the legislature to deal with "local affairs and government," and the determination of the court must be interpreted accordingly. The court did not intend to hold and did not hold that when the legislature acts upon a matter of state-wide concern as distinguished from a local affair, the legislature could not make such legislation applicable to cities of specified classes. What the court held was that when the legislature deals with local affairs as distinguished from matters

which are primarily of state-wide concern, it can only do so effectually by an act which affects with uniformity every city. It is true that this leaves a rather narrow field in which the home-rule amendment operates freed from legislative restriction, but there is no middle ground. Either the field within which the home-rule amendment operates must be narrowed or the field within which the legislature may operate must be narrowed, and as was pointed out in the *Baxter Case,* the amendment clearly contemplates legislative regulation of municipal affairs, and there was no intention on the part of the people in adopting the home-rule amendment to create a state within a state, an *imperium in imperio*. There was already in existence an example of that in the charter of the city of St. Louis in the state of Missouri.

In *State ex rel. Coyle v. Richter* (1931), 203 Wis. 595, 234 N. W. 909, the court had under consideration whether an ordinance of the common council of the city of Chippewa Falls was enacted under a home-rule amendment or pursuant to a power granted by act of the legislature, but for reasons there stated the court did not find it necessary to decide whether the ordinance constituted a reorganization under ch. 62 or the adoption of the form of government prescribed by ch. 62 as a home-rule charter.

So far as we are able to discover no one has undertaken to define what is meant by local affairs and government. In *Adler v. Deegan* (1929), 251 N. Y. 467, 167 N. E. 705, 713, Mr. Justice CARDOZO, then chief judge of the court of appeals, made the following observations in a concurring opinion:

"There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only. Illustrations of these I have given, the laying out of parks, the building of recreation piers, the institution of public concerts. Many more could be enumerated. Most important of all perhaps is the control of the locality over

payments from the local purse. (*Matter of Mayor, etc., of N. Y.* (Elm Street), 246 N. Y. 72, 158 N. E. 24.) There are other affairs exclusively those of the state, such as the law of domestic relations, of wills, of inheritance, of contracts, of crimes not essentially local (for example, larceny or forgery), the organization of courts, the procedure therein. . . . A zone, however, exists where state and city concerns overlap and intermingle. The constitution and the statute will not be read as enjoining an impossible dichotomy. The question to be faced is this, has the state surrendered the power to enact local laws by the usual forms of legislation where subjects of state concern are directly and substantially involved, though intermingled with these, and perhaps identical with them, are concerns proper to the city? So far as judicial precedents in the courts of New York are available for guidance, they deal with the interpretation of the 'affairs' of cities under the provisions of article XII of the constitution as it stood before its revision in 1923. [Citing cases.] They all point, however, to the holding that affairs, though concerns of a city, are subject, none the less, to regulation through the usual forms of legislation, if they are concerns also of the state."

In the same case POUND, J., in a concurring opinion said:

"A division between state affairs and city affairs is plainly indicated, both by the constitution and the city home-rule law passed pursuant to article XII, section 3, *supra,* to carry into effect the provisions of that section. That the amendment divides things that in their nature are indivisible by any scientific method of exclusive and inclusive classification has been suggested by an authority on the subject. (McBain, 37 Pol. Sc. Q. 655.) The line of demarcation must be drawn by the court as cases arise. The constitution makes no attempt to define laws relating to the property, affairs or government of cities, nor has the legislature, nor shall we at this time. One thing is clear. Under the carefully chosen language of the amendment a law may relate to or affect cities as civil divisions of the state or centers of population, without necessarily relating to the property, affairs or government of such cities."

In his concurring opinion, Cardozo, C. J., said upon this point:

"There may be difficulty at times in allocating interests to state or municipality, and in marking their respective limits when they seem to come together. If any one thing, however, has been settled in this realm of thought by unison of opinion, it is the state-wide extension of the interest in the maintenance of life and health. The advancement of that interest, like the advancement of education, is a function of the state at large."

While the language of the home-rule amendment to the constitution of the state of New York is not the same as the language of the home-rule amendment in this state, the discussion in the case of *Adler v. Deegan, supra,* in which there were besides the opinion of the court two concurring opinions and two dissenting opinions, is very illuminating and is one of the late authoritative discussions on the subject.

Both upon reason and authority it is considered and held in accordance with the holding in *State ex rel. Harbach v. Mayor, supra,* that the matter of the compensation of the police officers of the city is a part of a matter of state-wide concern and not a local affair within the meaning of the home-rule amendment, and, upon the principle stated in *State ex rel. Harbach v. Mayor, supra,* the city may not by a charter ordinance supplant the act of the legislature.

The height of a building in a specified class of cities while a matter of public health is a matter so far removed from it as to put it in a class by itself. There may be other like situations.

The power granted cities and villages by the home-rule amendment is the power to determine their local affairs and government. The amendment confers upon cities and villages no power to deal by way of charter ordinance with matters which are primarily of state-wide concern. It results

from this that the limitation contained in the section upon the power of the legislature is a limitation upon its power to deal with the local affairs and government of a city or village. Care must be taken to distinguish between the power of the legislature to deal with local affairs and its power to deal with matters primarily of state-wide concern. When the legislature deals with local affairs and government of a city, if its act is not to be subordinate to a charter ordinance, the act must be one which affects with uniformity every city. If in dealing with the local affairs of a city the legislature classifies cities so that the act does not apply with uniformity to every city, that act is subordinate to a charter ordinance relating to the same matter. A charter ordinance of a city is not subject to an act of the legislature dealing with local affairs unless the act affects with uniformity every city. *State ex rel. Sleeman v. Baxter, supra.* When the legislature deals with matters which are primarily matters of state-wide concern, it may deal with them free from any restriction contained in the home-rule amendment. The home-rule amendment did not withdraw from the legislature its power to deal with matters primarily of state-wide concern which it possessed before the adoption of the amendment. The power of the legislature to classify cities when it deals with local affairs of a city is impaired by the amendment. Its power to classify cities when it deals with matters of state-wide concern which are not also local affairs is unimpaired. The entire matter of the regulation of police being primarily a matter of state-wide concern, the charter ordinance adopted by the city of Madison was ineffectual for any purpose. The city of Madison could not by that device withdraw itself from the operation of sec. 62.13 (7). The trial court was in error therefore in not awarding compensation to the plaintiff at the rate of $7.50 for the entire period.

*By the Court.*—On the appeal of the plaintiff, that part of the judgment denying recovery at the rate of $7.50 per month for the remainder of the period is reversed. On the motion

of the defendant to review, that part of the judgment awarding recovery is affirmed, and the cause remanded to the trial court with directions to enter judgment as indicated in this opinion. Plaintiff to recover her costs in this court.

The following opinion was filed June 22, 1936:

PER CURIAM (*on motion for rehearing*). A motion for rehearing was made in this case and supported by briefs which have received our careful attention. Among other things it is argued that in the decision in this case the court overlooked the provisions of sec. 9, art. XIII, of the constitution of the state of Wisconsin, which provides:

"All city, town and village officers whose election or appointment is not provided for by this constitution shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people or appointed, as the legislature may direct."

On the strength of the decision in *O'Connor v. Fond du Lac* (1901), 109 Wis. 253, 85 N. W. 327, the cases there cited, and *People ex rel. Le Roy v. Hurlbut* (1871), 24 Mich. 44, 9 Am. Rep. 103, it is argued that municipal corporations in the state of Wisconsin have certain so-called inherent powers particularly those relating to local self-government. The position of counsel would be more tenable if the question were an open one in this state. From *Butler v. Milwaukee* (1862), 15 Wis. *493, to *Milwaukee v. Raulf* (1916), 164 Wis. 172, 159 N. W. 819, it has been consistently held that municipal corporations have only such powers as were conferred upon them by statute or those necessarily implied therefrom. In *Butler v. Milwaukee* the court said:

"Implications of authority in bodies corporate, more especially those created for municipal purposes, should be clear

and undoubted, and the party claiming through them should be able to point them out with certainty and precision. The fact that he cannot, is conclusive that they do not exist. Mere general arguments drawn from the convenience of possessing a power under certain circumstances in case of emergency—conclusions that, if possessed, it might be beneficially exercised, are very dangerous sources of corporate authority. . . . Implications spring from the necessities of some power actually conferred, and not from notions of what would be convenient or expedient under particular circumstances."

In *Sutter v. Milwaukee Board of Fire Underwriters* (1915), 161 Wis. 615, 155 N. W. 127, the court said:

"A municipal corporation in Wisconsin today is of the kind mentioned in art. XI of our constitution. The words now mean a body corporate consisting of the inhabitants of a designated area, created by the legislature, with or without the consent of such inhabitants, for governmental purposes, possessing local legislative and administrative power, also power to exercise within such area so much of the administrative power of the state as may be delegated to it, and possessing limited capacity to own and hold property and to act in purveyance of public conveniences."

In this connection it is to be remembered that the clause of the charter of the city of Milwaukee, which was construed in *Butler v. Milwaukee, supra,* was very broad. In addition to those powers expressly granted, the charter provided that the municipality should have "the general powers possessed by municipal corporations at common law." Whatever the law may be in other jurisdictions, it has never been the law in Wisconsin that municipal corporations possessed inherent powers of local self-government independent of legislative control. If they now possess such powers, it is due to the adoption of the home-rule amendment. It is true, as was held in *O'Connor v. Fond du Lac, supra,* that the power of the legislature to deprive municipalities of the right to elect their officers is protected by sec. 9, art. XIII, of the constitu-

tion. That section, however, does not attempt to confer powers, but prescribes how the officers therein specified shall be chosen, and leaves the definition of their functions to the legislature. While there is some language in *O'Connor v. Fond du Lac, supra,* that lends color to the argument made here, the question there under consideration was the power of the legislature to deprive the municipality of the right to choose its own police officers.

In the case under consideration, the legislature in no way attempted to interfere with the appointment of local police and fire officers. Under the law as it now exists and declared in this case, not only the choice of officers but to a considerable extent their duties are left wholly to local authority. The board of police and fire commissioners is just as local as the common council.

The whole controversy comes back to the question of what was meant by "local affairs and government." It is said that the fixing of salaries of policemen is a local affair. In a certain sense that is true, and it is so regarded by the legislature, because the power to fix salaries is lodged with local authorities. It is argued that the case of *State ex rel. Harbach v. Mayor* (1926), 189 Wis. 84, 206 N. W. 210, is not in point because it deals with the matter of education, which by the terms of the constitution (art. X) is vested in the state superintendent and such other officers as the legislature shall direct. The difficulty with this argument is that it proves too much.

The end sought to be attained by the provisions of art. X of the constitution was to require the state to assume the duty of providing for the establishment of free schools. Sec. 3, art. X, provides:

"The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for

tuition to all children between the ages of four and twenty years; and no sectarian instruction shall be allowed therein."

At the time the constitution was adopted, some states did not consider the furnishing of free education a state function. Where it was a state function it was one which had been assumed within comparatively recent times. In order that there might be no doubt as to where the responsibility lay, the constitution made it the duty of the legislature to provide free education. It is true that the constitution nowhere specifically provides that it shall be the duty of the state to preserve order and protect life and property unless it is to be found in the preamble, and if there it is expressed in very general terms. The reason why it was not expressed was because the preservation of order and the protection of life and property, in the language of the declaration of independence, the right to "life, liberty and the pursuit of happiness," are of the very essence of government and an essential function of a state. States have been organized for that express purpose from time immemorial. Education, especially two hundred years ago, stood upon a different basis. It was considered that the furnishing of free education was a duty which a state might or might not assume. What was said, therefore, in *State ex rel. Harbach v. Mayor, supra,* about the field of legislation relating to education, applies with greater instead of less force when we come to consider the duty of the state with respect to the preservation of order and the protection of life and property. To carry out its functions, the constitution provides for the creation of municipal corporations by the state. These from the beginning have been held to be agencies of the state with respect to these primary functions. While they may in many respects serve the locality in these highly important respects, they also discharge state functions, and the discharge of these functions is not a local affair or a matter of local government, but is a matter of state-wide concern and of state government.

There is a great deal of confused thinking upon the subject because of the failure to recognize the fact that many of the things which municipalities do seem to be local when they are in fact part of the obligations imposed upon the state by the constitution itself. It is said that certainly salaries of policemen are a local affair. As already pointed out, the legislature so considers them, and they are fixed by local authority. Because the state has vested the power in localities to fix these salaries, it has not made it a matter of local affair in the sense that it can be deprived of its right to see that an efficient, dependable police force is functioning in all parts of the state.

After a reconsideration of the entire matter, we adhere to our former determination. The motion for rehearing is denied.