**Grant MOGLE, Plaintiff-Appellant,**

v.

**SEVIER COUNTY SCHOOL DISTRICT et al., Defendants-Appellees.**

No. 74–1862.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 2, 1975.

Decided Aug. 11, 1976.

gle, Washington, D. C., and Michael T. McCoy, Salt Lake City, Utah, on the brief), for plaintiff-appellant.

Ken Chamberlain, Richfield, Utah (Olsen & Chamberlain, Richfield, Utah, and Vera C. Badham, Salt Lake City, Utah, of counsel, on the brief), for defendants-appellees.

Before HILL, HOLLOWAY and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff-appellant, Grant Mogle, brought this civil rights action under 42 U.S.C.A. §§ 1983 and 1985 against the Board of Education of Sevier County, Utah, the current superintendent of the Sevier County School District, Mr. Teeples, a former superintendent, Mr. Bennett, and the President and individual members of the Board of Education, all persons being sued in their official and individual capacities. Plaintiff alleged that he was unconstitutionally deprived of his employment as a school teacher and counselor as a result of the defendants' collective refusal to renew his employment contract and their refusal to reinstate him to his position of employment unless the plaintiff moved into and lived in the "North Sevier area." The complaint avers that the amount in controversy exceeds $10,000, exclusive of interest and costs, and claims jurisdiction under 28 U.S.C.A. §§ 1331 and 1343.

The amended complaint alleges that the imposition, into plaintiff's employment contract, of the condition that he live in the North Sevier area was arbitrary, capricious and unreasonable, violated his "rights to live where he chooses and to travel freely" and served no permissible governmental objective in that it bears no relationship to the effective or satisfactory performance of plaintiff's employment duties, all in violation of the Fifth and Fourteenth Amendments. Mogle sought injunctive relief for reinstatement and compensatory and punitive damages.

On the answers to interrogatories, admissions, depositions and affidavits, the trial court granted the defendants' motion for

Elise T. Snyder, Washington, D. C. (Jerry D. Anker, Robert E. Nagle, Steven E. Silverman of Lichtman, Abeles, Anker & Na-

summary judgment. The court concluded that "no substantial federal question is raised by plaintiff's claim and hence the cause of action does not come within the jurisdictional provisions relied upon by the plaintiff." Plaintiff appeals from this summary judgment dismissing the cause.

I

*The factual background*

The plaintiff's deposition showed the following facts:

Grant Mogle was employed as an elementary school teacher by the Sevier County School Board under annual contracts from 1964 to 1968. He did not teach during the 1968–69 school year because he went into business with his father for one year. In the Spring of 1969 Mogle was approached by Roger Nielson, principal of North Sevier High School, and asked if he would be interested in a counseling job at the high school. Mogle accepted the position and began work in the fall of 1969. The amended complaint states that plaintiff accepted a counseling position in the 1969–70 school year, and alleges that plaintiff is entitled to be reinstated as a counselor with a salary and benefits commensurate with that which he would have had, had he not been unlawfully terminated (R. Vol. III, 146–154). Mogle's deposition shows that he spent a substantial portion of his time teaching in addition to counseling.

At the time he was hired Mogle resided in Centerfield, Utah, a town approximately eleven miles from Salina, Utah, the location of North Sevier High School. Centerfield had a population of about 420 and is located within Sampete County. Salina had a population of about 1500 and is located in Sevier County.[1]

When Moble first discussed the job with defendant Superintendent Bennett, there was some mention of Mogle's moving within the boundaries of the school district. Ac-

cording to Mogle, Bennett said, "we would like you to move over." Mogle assumed "over" meant into the North Sevier area. Mogle said Bennett put no time limitation on the requested move, expressed no sense of urgency about it, and gave no reasons for the request. Mogle said the request bothered him but that he did not express any objection to Bennett. Mogle did mention Bennett's request to Mr. Nielson, the Principal of North Sevier High School. According to Mogle, Nielson thought the move was unnecessary, for he was concerned only that Mogle be able to get to school and perform assigned responsibilities.

Superintendent Bennett next mentioned the residency issue to Mogle some time around Christmas of 1971. Bennett was visiting North Sevier High School that day and asked Mogle when he was going to move. Bennett apparently expressed his view that Mogle had been given enough time and that he ought to be moving soon. Mogle replied that he and his family were trying to find a place to live in Salina, but they were encountering difficulty due to a tight housing market and a lack of finances.[2] Bennett suggested a mobile home or a prefabricated home as a possible alternative; he gave Mogle no ultimatum at this time.

A similar discussion took place in March, 1972, at which time Bennett told Mogle that a contract for the coming year, 1972–73, might not be offered if Mogle didn't move. Again Mogle replied that he was trying to find a new home. Mogle's deposition states that he definitely knew after this conversation that he would have to move if he was to have a job for the coming year.

Mogle, troubled by Bennett's request, inquired of one of his neighbors in Centerfield, a Mrs. Frandsen, who was also a teacher employed by the Sevier School Board, whether she had been confronted with this kind of request or ultimatum. He received a negative reply. Mogle then re-

---

1. The 1970 decennial census showed a population of 419 for Centerfield and 1494 for Salina.

2. Mogle is married and lives with his wife and six children. He says that throughout his final teaching year he had difficulty finding a suitably large house in the Salina area.

quested the School Board to grant him a few minutes of time at their next regularly scheduled meeting on April 27, 1972, in order that he might present his problem.

Mogle appeared at the Board meeting and presented a written proposal. According to Mogle, a discussion ensued during which the Board expressed its general concern that Mogle was paying taxes in Sampete County while getting paid in Sevier County. He said the main issue seemed to be that he ought to be living in Sevier County if that was where he was going to get paid. Mogle also says "they thought I ought to be in the community but they didn't say for what reason." Mogle recalled that defendant Manning was particularly strong in his statements "about that," apparently referring back to the concern over the taxing location.

Mogle brought up the fact that his neighbor, Mrs. Frandsen, wasn't subject to the announced policy. He said the Board explained this away by replying that she was hired when teachers were hard to get and it was thought she would only stay for one year. Mogle said he was led to believe there was a policy on residency regarding only him; he was greatly disturbed that the policy, if it existed, didn't apply to all teachers. Mogle said he had no prior knowledge of any such policy and that none was discussed with him at the time he was hired. He said he had made an inquiry to one of the Board members, defendant Glover, concerning the origin of the policy and defendant Glover answered that he didn't know.

When Mogle received his 1972–73 school year contract in the latter part of May, 1972, the following sentence was typed into paragraph 6:

For this contract to be valid [the teacher] must be living in the North Sevier area by the beginning of the 1972–73 school year (Vol. III, p. 11).

The school year was scheduled to begin for Mogle on August 11, 1972. Mogle signed and returned the contract with the intention of making a good faith effort to comply with the residency provision (See Mogle's Deposition, 60–61).

At this point the Mogles increased their efforts to find a house in Salina. They listed their own home for sale and found one house in Salina they were very near purchasing. However, they were unable to obtain F.H.A. approval of the necessary loan because the home was too small for their size family. Mogle spent much of the time during the summer of 1972 in Provo, Utah, at Brigham Young University finishing the requirements for his master's degree, but he did spend time looking for another home in Salina (Id. at 60–61).

After these difficulties in his efforts to move, Mogle phoned Bennett early in August to report on his troubles. Bennett replied that he would have to discuss the problem with the School Board at its regular meeting on August 10. Mogle was later informed by his wife that Bennett had called while Mogle was in Provo and had "told her the board had met and that it was their decision they would let me go unless I was there on the date specified." Bennett left word with Mogle's wife "that if there was any change in my particular moving circumstances by the next day to let him know."

Mogle had contacted the Utah Education Association in May, 1972, about his troubles. Mr. Walters, an official of the Association, made several contacts with the Board on Mogle's behalf. His deposition states that Walters asked Superintendent Bennett why they didn't apply the policy to Mrs. Frandsen; that Bennett said she was hired when it was hard to get teachers, and they didn't think she would be employed more than a year or two; that she had been with them for many years and therefore they did not place the stipulation on her. Walters said they were being unfair and discriminatory, and Bennett said they were prepared to take it to court.

Later Walters asked the new Superintendent, Mr. Teeples, to produce any written policy on the point, and Teeples said they didn't have one in writing. When Walters appeared before the Board, he was told that although they didn't have an official policy in writing and another teacher

lived outside the district, they were going to enforce the policy. The contacts with the Board were unavailing and plaintiff brought this suit in January, 1974.

Among other things, the defendants asserted that there was a policy requiring counselors to reside in the proximity of the school where they serve. The reasons for the Board's policy and actions were stated in the affidavits of Superintendent Bennett and Superintendent Teeples.[3] Essentially the reasons concerned the difficulties of parents and students getting in touch with the counselor because of distance problems; the difficulty of non-resident counselors getting acquainted with parents and students; difficulty in the counselor's acquaintance with community problems; limitation of knowledge of career opportunities; inability to make contribution to community activities; and inconvenience due to the distance from student records, and the like.

Plaintiff Mogle filed an opposing affidavit in which he stated that the defendants' affidavits presented the "first opportunity plaintiff has had to examine the reasons advanced by any of the defendants for requiring him to reside within the defendant school district and plaintiff was never advised of any of these reasons prior to the date his employment was terminated." (R. III, 157). The affidavit further stated that:

As counselor and part-time coach, he [plaintiff] was available at the North Sevier High School early in the mornings until late in the afternoons of each school day. Never during his employment with defendant School Board, was he asked by any person employed by the defendant Board of Education to work longer hours or to make himself more available to the students or faculty members of the High School. (R. III, 157)

The plaintiff also stated:

He [plaintiff] lives and at the time his employment was terminated by the defendant Board of Education, he lived only eleven miles from North Sevier High School where he was employed. At the time he was employed by the Board of Education he knew the community in which he taught and was available in all and any special problems which in any way related to his job.

At no time did any member of the Board of Education of Sevier County or any of its employees inform him that he was not doing a good job or that he was required to be more readily available to the students, faculty or community in which the High School was located. (R. III, 158–59)

The trial judge concluded that "no substantial federal question is raised by plaintiff's claim and hence the cause of action does not come within the jurisdictional provision relied upon by plaintiff." The court granted the defendants' motion for summary judgment and dismissed the matter as to all defendants, and plaintiff appealed from that ruling.

As we turn to the appellate contentions, we must note that where different ultimate inferences may properly be drawn, the case is not one for summary judgment. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176. Summary judgment papers must be viewed in the light most favorable to the party opposing the motion. *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir.). Moreover, the right to a summary judgment must be shown by the moving party beyond a reasonable doubt. See *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.). We have reviewed the facts in considerable detail in order to apply these rules in considering this appeal.

II

*The Equal Protection challenge*

Plaintiff strenuously urges that the residency requirement imposed on one occupation, school counselors—and in practical effect on only one person—violates the Equal

---

**3.** Portions of the affidavits expressing the reasons for the decision are reproduced in the appendix to this opinion.

Protection Clause. He challenges the classifications creating a distinction between resident and non-resident counselors. He argues that the policy and decision applied to him are so arbitrary and discriminatory, and so lacking in any rational justification as to constitute a deprivation of equal protection, relying on *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *Dunn v. Blumenstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306; *Hanson v. Unified School District,* 364 F.Supp. 330 (D.Kan.), and similar cases.[4]

At the outset we must consider the standard to follow in deciding the claim under the Equal Protection Clause. It is true that durational residency requirements were reviewed in *Shapiro, Dunn* and *Memorial Hospital* under the compelling governmental interest test. We are persuaded, however, that now it is reasonably clear that a continuing residency requirement is instead subjected to the less scrutinizing standard generally applied in equal protection cases. We feel this is shown by the Court's recent decision in *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 considered in conjunction with its earlier ruling in *Detroit Police Officers Assn. v. City of Detroit,* 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227, dismissing for want of a substantial federal question the appeal from the decision of the Michigan Supreme Court in *Detroit Police Officers Assn. v. City of Detroit,* 385 Mich. 519, 190 N.W.2d 97.

The Michigan Court appears to have decided and rejected the equal protection challenge to the continuing residency requirement as applied to Detroit police officers under the general formulation of the equal protection standards, saying that the classification was not "invidious" and was "at least debatably productive of proper municipal goals." 190 N.W.2d at 97–99. No analysis was made in terms of any compelling interest, and the Court found no infringement on interstate travel or similar fundamental rights. The Supreme Court has referred expressly to the authoritativeness of its dismissal of the appeal. See *McCarthy,* 424 U.S. 645, 646, 96 S.Ct. 1154, 47 L.Ed.2d 366, see also *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223. We feel that the ruling in *Detroit Police Officers Assn.* must imply approval of the standard applied, since if a higher test were required, the result might well be different. Moreover, the opinion in *McCarthy* itself speaks of having held "that this kind of ordinance is not irrational." 424 U.S. 646, 96 S.Ct. at 1154. And *McCarthy* simply differentiates between a requirement of continuing residency and a requirement of prior residency of a given duration in rejecting the claim of impairment of the constitutional right to interstate travel. Without such a right being involved, the general rational basis test applied. See also *Wardwell v. Board of Education of Cincinnati,* 529 F.2d 625, 628 (6th Cir.), cited in *McCarthy.*

Under the traditional standard, the classification challenged here—differentiating between resident and non-resident counselors—must at a minimum bear some rational relationship to a legitimate state purpose. *Weber v. Aetna Casualty & Surity Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 31

---

4. Since argument the plaintiff submitted a Supplemental Memorandum addressing the recent decision in *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366, decided March 22, 1976. The memorandum recognizes that some arguments advanced earlier by plaintiff are not available after *McCarthy* but clearly it does not abandon the primary challenge to the residency policy under the Equal Protection Clause. While it speaks of being precluded from relying on the Due Process Clause by our recent decision in *Weathers v. West Yuma School District,* 530 F.2d 1335 (10th Cir.), we do not understand the plaintiff to withdraw its challenge under the conclusive presumption cases (See Appellant's Supplemental Memorandum submitted May 10, 1976, especially p. 4, n. 1).

We also read the briefs and the Memorandum as continuing to argue that the compelling governmental interest test applies in giving constitutional scrutiny to the policy in question.

L.Ed.2d 768. Moreover, the policy is presumed to be constitutional even if source materials normally resorted to for ascertaining its grounds are silent; and its classifications will "be set aside only if no grounds can be conceived to justify them." See *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739.

■ It is true that there was no written rule or policy on the residency requirement in this case. The reasons for the rule were apparently not articulated until during the preparations in this case. Nevertheless, there are grounds stated by the affidavits of Superintendent Bennett and Superintendent Teeples. The residency requirement was related to the difficulty for parents and students to get in touch with the counselor because of distance problems; the difficulty for parents and students to become personally acquainted with the counselor; the difficulty in the counselor's becoming acquainted with the community and its problems; the inability of the non-resident counselor to make contribution to community activities; and, the counselor being responsible for cumulative student records, the inconvenience for him to live a long distance from where the records are kept. See Appendix to this opinion.

Plaintiff refers to his opposing affidavits and deposition showing his availability at the school from early each morning until late each afternoon, and to the absence of any statement by Board members that he was not doing a good job or that he was required to be more readily available to students and others. We note also that there was only an eleven mile distance from his home to Sevier and agree, too, that the very small communities involved present no problems of the magnitude of those of large cities. Nevertheless, the reasons for the policy as given by the defendants are not wholly insubstantial. We must accord the policy and the classifications the usual pre-

sumption of validity and they may be set aside only if no grounds can be conceived to justify them. *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739.

We must hold that, although the grounds to support the classifications are less substantial than those outlined in *Wardwell v. Board of Election*, 529 F.2d 625, 628 (6th Cir.), the policy and decision applied to plaintiff do not violate the Equal Protection Clause.

### III

*The conclusive presumption challenge*

■ Plaintiff argues further that the residence requirement violated his right to due process by creating a conclusive and irrebuttable presumption that he could not properly perform his duties unless he resided within the school district, relying on *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52, and other similar cases.

We cannot agree. As the Court noted in *Vlandis*, supra, 412 U.S. at 452, 93 S.Ct. 2230, the State there purported to be concerned with residency in allocating differing tuition rates. It classified students for the purpose of this fact by permanent and irrebuttable presumptions, e. g., non-residency was established if the unmarried student had a legal address outside the State for any part of the year immediately prior to his application. *LaFleur* involved the Cleveland requirement of a teacher's taking maternity leave without pay beginning five months before the expected birth of her child and prohibiting her return until sometime after the child reaches the age of three months. The requirement decided the fact and duration of incapacity by an irrebuttable presumption.[5]

In each case, in effect, a fact question was identified and then decided by a conclu-

---

5. The case also held invalid a similar Chesterfield County provision requiring that leave be taken at least four months before the expected birth. However, the Chesterfield County provi-

sion for eligibility to return to teaching by furnishing a medical certificate was upheld. 414 U.S. at 650, 94 S.Ct. 791.

sive presumption.[6] In *LaFleur* the Court referred to the irrebuttable presumption concerning a woman's physical incompetency when the medical evidence as to an individual woman's physical status might be wholly to the contrary. See 414 U.S. at 644, 649, n. 15, 94 S.Ct. 791. In *Vlandis* it spoke of the fact that the presumption of non-residence was not necessarily or universally true in fact. See 412 U.S. at 452, 93 S.Ct. 2230. The factual presumptions in both cases were held unwarranted and a denial of due process.

In our case, the residency requirement does not involve such identification of a controlling fact question and decision of it by an irrebuttable presumption. There are numerous factors that may undergird the policy and the line drawn by the Board. It is not shown that application of the policy to this plaintiff involves a presumption against him on any particular point. In such a case, we do not feel the conclusive presumption doctrine was intended to apply. The Supreme Court has disapproved extension of the doctrine which would make it destructive of numerous legislative judgments drawing lines. See *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 45 L.Ed.2d 522.

Initially plaintiff also argued, as a separate point, that the Board's determination was so arbitrary and capricious as to deny due process. However, he now states that our decision in *Weathers v. West Yuma County School District*, 530 F.2d 1335 (10th Cir.), precludes such reliance by him on the Due Process Clause and we need not reach that point.

We are unable to agree with the trial court's view that no substantial federal question was presented. Nevertheless, under the constitutional standards we must apply, we feel that summary judgment for the defendants was proper.

AFFIRMED.

---

**6.** The essentials of a presumption of fact were present: an inference about the existence of a fact not proven (a presumed fact) from the existence of another fact which has been proven (basic fact). See 4 J. Wigmore, Evidence

APPENDIX

The affidavit of defendant Superintendent Bennett stated that the decisions to insert and enforce the contractual provision:

were based entirely and exclusively upon the necessity to obtain the services of a counsellor who resided in close proximity to the school where he served and the compelling interest of having a counsellor who did not have both his residence and substantial other outside employment and occupation in another community.

(R. III, 168).

Bennett's affidavit further stated:

A. The Board of Education has never at any time maintained a policy that no teacher residing outside Sevier County or Sevier County School District could be employed or teach within the District.

B. The School District has had, at all times material to this action, a policy that counsellors must reside in the proximity of the school where they serve and those are based upon the following considerations:

Certain services were not being provided students in the North Sevier High School attendance area because the counsellor lived outside that attendance area;

It is difficult for parents and students to get in touch with the counsellor because of the distance problem;

It is difficult for parents and students to become personally acquainted with the counsellor;

It is more difficult because of folkways and mores for the counsellor to become acquainted with the community and its problems and feelings are generated in the community that the counsellor is an "outsider" and his allegiance to the high school is in jeopardy as the result of living in another county;

§ 1356(a) (Chadbourne rev. 1972). However, such a presumption normally is rebuttable by presentation of contrary evidence. 9 id. § 2490 (3d ed. 1940).

The counsellor's knowledge of career opportunities is more limited because he is not living in the community and having first hand knowledge of those career activities;

The counsellor is unable to make any contribution of services to the community in civic and church activities, is not immediately available for personal contact by police officers, clergymen, doctors, principals, and other service agencies and a long distance phone call is required if a counsellor is contacted at home by students or parents or both;

A counsellor is responsible for cumulative records of the students and it is inconvenient for him to live a long distance from where the records are kept; there is a substantial demand upon student record data in spring and early fall.

(R. III, 168–69)

The affidavit of defendant Superintendent Teeples restated the above reasons for the school board's policy, and offered these additional comments:

The Board of Education has and in 1972 had a policy, however, requiring guidance counsellors to live in close proximity to the school where they are employed and the reasons therefor are that the school counsellor is the psychological hub of the school from which all lines of communication extend to both the faculty and to the student body. The counsellor's availability and familiarity with the local community are requisite to his effective performance. A commuter, and particularly one who has virtually full-time employment totally disassociated with his school's activities and also located in another community and one who would be, after school hours, totally preoccupied with the combined problems of commuting and the requirements of that disassociated and unrelated work, deprive those desiring his counselling services at critical moments. The counsellor must be readily available to cope with crises the same as a fireman or a policeman. A student's unresolved problem such as a communication breakdown between a student and a faculty member requires immediate attention. A friend, a neighbor and a resident of the community can fulfill the role of counsellor far more effectively than the commuter who maintains the distance he has established between his work involvement and the other world of his residency and his other occupation;

(R. III, 171).

Teeples' affidavit also stated that:

The problems created by commuting, distance, and virtually full time additional employment prevent a face-to-face contact between the counsellor and his students. Some home visits could otherwise be made if the counsellor lived in the student residency area.

(R. III, 172).