James A. Black, Glen J. Podlesnik and
Steven J. Van Erden, Plaintiffs-Respondents,

Milwaukee Professional Fire Fighters Association
Local 215, Intervenor-Plaintiff-Respondent,

Milwaukee Police Association and
Michael V. Crivello,
Plaintiffs-Respondents-Cross-Appellants, †

v.

City of Milwaukee,
Defendant-Appellant-Cross-Respondent.

Court of Appeals

*No. 2014AP400. Oral argument April 21, 2015.
—Decided July 21, 2015.*

2015 WI App 60

(Also reported in 869 N.W.2d 522.)

† Petition for Review Granted.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Grant F. Langley*, City Attorney, and *Miriam R. Horwitz*, Deputy City Attorney.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the brief of *Jonathan Cermele* of *Cermele & Matthews, S.C.*, of Milwaukee.

On behalf of the intervenor-plaintiff-respondent, the cause was submitted on the brief of *John F. Fuchs* and *Rebecca D. Boyle* of *Fuchs & Boyle, S.C.*, of Milwaukee.

An amicus curiae brief was filed on behalf of the League of Wisconsin Municipalities by *Claire Silverman* of Madison.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Wisconsin's "home rule" amendment, WIS. CONST. art. XI, § 3.(1), provides, as relevant here, that "[c]ities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village." This means, broadly speaking, that where a city has created law under its "home rule" authority, any state law in conflict must yield to the local law unless it involves a matter of "statewide concern" and affects every city or village with uniformity.

¶ 2. In this case, we are asked to determine which of two competing pieces of legislation—one created by the state legislature, and one created by the City of Milwaukee under "home rule" authority—has the force of law. The City of Milwaukee ordinance at issue, Ordinance 5–02, requires all city employees to live in the City of Milwaukee. The state statute at issue, WIS. STAT. § 66.0502 (2013–14),[1] abolishes local residency requirements. Following cross motions for summary judgment, the trial court declared that § 66.0502 involves a matter of statewide concern, affects all local governmental units uniformly, and consequently, pursuant to the home rule amendment, trumps the Milwaukee ordinance. The trial court also determined that § 66.0502 creates a constitutional liberty interest, but that the City did not violate that interest after the Common Council effected a short-lived resolution directing City officials to enforce the local residency ordinance instead of the state law. On

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

appeal, the City appeals the declaration that § 66.0502 involves a matter of statewide concern, affects all local governmental units uniformly, and trumps the Milwaukee ordinance. The City also appeals the declaration that § 66.0502 creates a constitutional liberty interest. The Milwaukee Police Association and Michael Crivello[2] appeal the declaration that the City did not violate their liberty interest.

¶ 3. We reverse the trial court on its first two declarations and conclude that: (1) because WIS. STAT. § 66.0502 does *not* involve a matter of statewide concern and does *not* affect all local governmental units uniformly, it does not trump the Milwaukee ordinance; and (2) § 66.0502 does not create a protectable liberty interest. Consequently, the City of Milwaukee may continue to enforce City Ordinance 5–02, which remains good law. We also affirm the trial court's decision that the City did not violate any of the constitutional rights of the members of the Police Association.

### BACKGROUND

*Legislation at Issue*

¶ 4. In June 2013, WIS. STAT. § 66.0502, "Employee Residency Requirements Prohibited," was signed into law. *See* 2013 Wis. Act 20, § 1270. Section 66.0502 prohibits local governments from enacting and enforcing residency requirements of any kind, except for those that require police officers, firefighters, or

---

[2] Even though the Milwaukee Police Association and Michael Crivello are the only Respondents who cross-appeal, we will henceforth generally refer to all Respondents as "the Police Association" for ease of reference.

other emergency personnel to reside within fifteen miles of a local governmental unit. The statute provides:

(1) The legislature finds that public employee residency requirements are a matter of statewide concern.

(2) In this section, "local governmental unit" means any city, village, town, county, or school district.

(3)(a) Except as provided in sub. (4), no local governmental unit may require, as a condition of employment, that any employee or prospective employee reside within any jurisdictional limit.

(b) If a local governmental unit has a residency requirement that is in effect on July 2, 2013, the residency requirement does not apply and may not be enforced.

(4)(a) This section does not affect any statute that requires residency within the jurisdictional limits of any local governmental unit or any provision of state or local law that requires residency in this state.

(b) Subject to par. (c), a local governmental unit may impose a residency requirement on law enforcement, fire, or emergency personnel that requires such personnel to reside within 15 miles of the jurisdictional boundaries of the local governmental unit.

(c) If the local governmental unit is a county, the county may impose a residency requirement on law enforcement, fire, or emergency personnel that requires such personnel to reside within 15 miles of the jurisdictional boundaries of the city, village, or town to which the personnel are assigned.

(d) A residency requirement imposed by a local governmental unit under par. (b) or (c) does not apply

to any volunteer law enforcement, fire, or emergency personnel who are employees of a local governmental unit.

## *Impact of Legislation*

¶ 5. While the new law states that "residency requirements are a matter of statewide concern," *see* WIS. STAT. § 66.0502(1), the facts in the record before us primarily concern the law's impact on the city of Milwaukee—which, for over seventy-five years, has required its employees to reside within the city. Our primary source in understanding the impact of abolishing local residency requirements is Paper #554 of the Legislative Fiscal Bureau,[3] prepared on May 9, 2013, over a month before § 66.0502 was passed, titled, "Local Government Employee Residency Requirements." The Legislative Fiscal Bureau paper begins by discussing the applicability of residency requirements across the state generally, citing a study indicating that while 114 municipalities and about thirty counties restrict where their employees may reside in some fashion, only thirteen municipalities and three counties require all of their employees to live within the municipal limits. As we will soon see, however, the Legislative Fiscal Bureau paper otherwise focuses almost wholly on the impact abolishing local residency requirements would have on the City of Milwaukee.

¶ 6. The first portion of the Legislative Fiscal Bureau paper's analysis, *"Impact on Local Economy and Budgets,"* pertains solely to the impact abolishing

---

[3] The Wisconsin Legislative Fiscal Bureau is a nonpartisan service agency of the Wisconsin Legislature. The Bureau provides fiscal and program information and analyses to the Wisconsin Legislature, its committees, and individual legislators.

634

residency requirements would have on Milwaukee. This part of the report states that "[f]or Milwaukee . . . it is believed by some that doing away with the [residency] requirement would impact the city's employment levels and lead to an exodus from the city, causing downward pressure on the home values in that city's neighborhoods." Specifically, the report notes that the city "employs nearly 7,200 individuals," several city neighborhoods "contain heavy concentrations of city and school district employees," and that these employees not only have higher salary levels than the city average, but also "these higher salary levels carry through to the value of homes owned by their employees, which . . . are 20% higher than the average home value in the City." The analysis further explains that if large numbers of city employees leave Milwaukee, "the levels of employment, incomes, and home values in certain neighborhoods of the City could be negatively impacted."

¶ 7. Significantly, the *Impact on Local Economy and Budgets* portion of the Legislative Fiscal Bureau paper's analysis warns that abolishing residency requirements could result in Milwaukee's suffering the same economic decline recently experienced by the city of Detroit. It states that while "the actual level of out-migration of public employees from the City of Milwaukee can only be speculated on at this point," other Midwestern cities—including Detroit and Minneapolis—saw significant shifts in population following the lifting of residency requirements. In Detroit, fifty-three percent of the police force moved outside the city, contributing to Detroit's well-known population decline—one in which the population of Detroit once comprised "nearly two-thirds of its metropolitan area's population, but now makes up less

635

than one-fourth." Even in Minneapolis, which is smaller and does not have the same industrial background as Detroit and Milwaukee—the percentage of city employees residing in the city declined from "nearly 70% when the requirement was in place to only 30% now." The report surmised that Milwaukee could face the same fate as these cities, despite arguments to the contrary:

> Employee groups and opponents of residency requirements tend to downplay the timing of how quickly, and degree to which, public employees would leave the City of Milwaukee if residency requirements are removed. They note that the employees would have to sell their homes before leaving, which could take some time . . . . However, given that public employees, their unions, and associations want relief from the residency requirements in Milwaukee, it would seem somewhat evident that providing that relief could lead to some number of those public employees migrating out of the City.

¶ 8. The subsequent portions of the Legislative Fiscal Bureau paper's analysis are much like the *Impact on Local Economy and Budgets*" section; the focus is almost singularly devoted to discussing the effect lifting residency requirements would have on the City of Milwaukee. The section titled "*Local Control and Use of Local Tax Dollars*" states that "*several* local government officials, boards, and organizations have indicated their opposition" to lifting residency requirements because "it removes from local control a matter that is of local, not state concern" (emphasis added), but the substantive discussion primarily focuses on the legal arguments of City of Milwaukee officials. The section "*Living in Your City of Employment*" focuses on general policy arguments for and against residency

requirements, and does not discuss any particular locality. The *"Impact on Recruitment"* section focuses primarily on Milwaukee, explaining, among other things, that City of Milwaukee officials received forty-two applications per recruited position since 2010—suggesting that residency requirements do not impede the City's ability "to attract quality candidates to City positions." And the *"Impact on Employees' Lives"* section, which discusses how municipal employees choose to educate their children, also focuses primarily on Milwaukee.

## *Procedural History*

¶ 9. On July 2, 2013, shortly after WIS. STAT. § 66.0502 was signed into law, the City of Milwaukee Common Council adopted a resolution concluding that the new statute violated Article XI, Section 3.(1) of the Wisconsin Constitution, which allows cities and villages to "determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or village." *See* WIS. CONST. art. XI, § 3.(1). The City's resolution further directed all City officials to continue enforcing its local residency rule, Milwaukee City Ordinance 5–02.

¶ 10. The Police Association consequently filed suit on July 10, 2013, seeking a judgment declaring that the City's residency ordinance and resolution were unenforceable to the extent they conflicted with WIS. STAT. § 66.0502. The Police Association further sought judgment and damages under 42 U.S.C. § 1983, alleging that the City's continuing enforcement of its residency ordinance constituted a deprivation of liberty interests without just cause.

637

¶ 11. After the parties filed cross-motions for summary judgment, the trial court issued an order declaring the City of Milwaukee Ordinance 5–02 and the Common Council's Resolution void and unenforceable to the extent they violate the terms of Wis. Stat. § 66.0502. Specifically, the trial court determined that the City's ordinance must, pursuant to Wis. Const. art. XI, § 3.(1), yield to the new state statute because the statute "relates to a matter of primarily statewide concern and applies uniformly to all local governmental units in this state." The trial court further found that § 66.0502 creates a protectable liberty interest, but that there was no evidence of actionable deprivation.[4] The parties now appeal. Additional facts will be developed as necessary below.

## ANALYSIS

### Legal Standards

¶ 12. On appeal, we must determine whether the trial court was correct in declaring that Milwaukee City Ordinance 5–02 and the corresponding Common Council resolution are void and unenforceable to the extent they violate Wis. Stat. § 66.0502. In other words, we must determine whether § 66.0502 trumps the City's local ordinance. This is a question of law we review *de novo*. *See Wright v. Allstate Cas. Co.*, 2011 WI App 37, ¶ 11, 331 Wis. 2d 754, 797 N.W.2d 531 ("We review both summary and declaratory judgments *de novo*, applying the same methodology as the trial

---

[4] The parties have stipulated that the City will not enforce its residency rule or take any disciplinary action relating thereto until this appeal is decided.

court."); *Sisson v. Hansen Storage Co.*, 2008 WI App 111, ¶ 3, 313 Wis. 2d 411, 756 N.W.2d 667 ("our interpretation and application of statutes is also *de novo*").

¶ 13.  At the outset of our discussion, we note that Wisconsin municipalities, including the City of Milwaukee, derive authority to govern their affairs—or "home rule" authority—from two distinct sources:  the state constitution and statute. Statutory home rule authority derives from WIS. STAT. § 61.34 (villages) and WIS. STAT. § 62.11(5) (cities), and grants municipalities broad powers except where other statutes elsewhere limit them. Constitutional home rule authority derives from WIS. CONST. art. XI, § 3.(1), which, as we have seen, provides:  "[c]ities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village."

¶ 14.  There is no dispute that the authority for Milwaukee City Ordinance 5–02, which is at issue here, derives from constitutional "home rule" power. The Home Rule Amendment, WIS. CONST. art. XI, § 3.(1) accomplishes two things:

> First, it makes a direct grant of legislative power to municipalities, so that such powers are now held by express grant in and by the constitution, whereas formerly any such power was held solely through and by the legislature, which might give, amend, or take away.
>
> Second, it limits the legislature in the exercise of its general grant of legislative power . . . found in sec. 1, art. IV, Const.

*See State ex rel. Ekern v. City of Milwaukee*, 190 Wis.

633, 637–38, 209 N.W. 860 (1926) (internal citations omitted). A review of the home rule amendment's "history demonstrates that it was enacted in response to calls 'to decrease the role of the state legislature in establishing municipal governments and to provide cities and villages with greater authority to determine their own affairs.' " *See Madison Teachers, Inc. v. Walker*, 2014 WI 99, ¶ 220, 358 Wis. 2d 1, 851 N.W.2d 337 (Bradley, J., dissenting) (citation omitted).

■■

¶ 15. "[W]hen a power is conferred by the home-rule amendment, it is within the protection of the constitution and cannot be withdrawn [merely] by legislative act." *Van Gilder v. City of Madison*, 222 Wis. 58, 72, 267 N.W. 25 (1936). Rather, a state statute will be found to trump a local ordinance that derives from constitutional home rule only if it passes the following two-part test:

> [W]hen reviewing a legislative enactment under the home rule amendment, we apply a two-step analysis. First, as a threshold matter, the court determines whether the statute concerns a matter of primarily statewide or primarily local concern. If the statute concerns a matter of primarily statewide interest, the home rule amendment is not implicated and our analysis ends. If, however, the statute concerns a matter of primarily local affairs, the reviewing court then examines whether the statute satisfies the uniformity requirement. If the statute does not, it violates the home rule amendment.

*See Madison Teachers*, 358 Wis. 2d 1, ¶ 101. We note that the test articulated in *Madison Teachers* is somewhat at odds with the plain language of the home rule amendment, which does not contemplate a two-step inquiry that "ends" simply by the existence of a statute

640

concerning primarily a statewide interest. *See* WIS. CONST. art. XI, § 3.(1); *see also State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' "). Nevertheless, *Madison Teachers* not only articulates what the test should be, but also applies that test, which means it is not dicta. *See Zarder v. Humana Ins. Co.*, 2010 WI 35, ¶ 52 n.19, 324 Wis. 2d 325, 782 N.W.2d 682. Therefore, we must apply the test as stated by the supreme court. *See id.*, ¶ 54.

■■
¶ 16.   Whether a particular statute relates to a matter of statewide concern "is for the courts to determine." *State ex rel. Michalek v. LeGrand*, 77 Wis. 2d 520, 527–28, 253 N.W.2d 505 (1977). We do so on a case-by-case basis. *See Ekern*, 190 Wis. at 638 ("No standard is . . . fixed for defining" what is a matter of statewide or local concern, "nor is any help afforded by decisions from other jurisdictions under constitutional provisions aiming in the same direction."). Generally, state legislation falls into three categories:   (1) those involving matters exclusively of statewide concern; (2) those involving matters entirely of local character; and (3) those that encompass both state and local concerns. *See Michalek*, 77 Wis. 2d at 526–27. If we determine that legislation falls under the third category, we must determine whether state or local concerns are paramount and conduct our analysis accordingly. *See id.* at 527–28.

■■
¶ 17.   In determining whether legislation is a matter of statewide concern, we must be mindful that while tension will always exist between state and local

power, *see Van Gilder*, 222 Wis. at 67, our constitution must be the controlling document guiding the course of state affairs, *see Ekern*, 190 Wis. at 639. *Van Gilder* further explained:

> A valid argument could be based upon the proposition that whenever the legislature sought in the exercise of the power thus conferred to deal with any existing situation, by that very act that matter became a matter of state-wide concern. Manifestly, however, the words "state-wide concern" could not have been used with that precise meaning because the legislature itself would under such construction have the power of whittling away the provisions of the home-rule amendment. It must be assumed that some useful purpose and proper end was sought by the adoption of the amendment.

*Id.*, 222 Wis. at 67. Thus, we take great care to construe our state constitution liberally, "looking toward virility rather than impotency." *See Ekern*, 190 Wis. at 639.

██ ██

¶ 18. In determining whether a particular statute satisfies the uniformity requirement, "our case law has consistently held that the legislature may ... enact legislation that is under the home rule authority of a city or village if it with uniformity 'affect[s] every city or every village.' " *Madison Teachers*, 358 Wis. 2d 1, ¶ 99 (citation omitted; brackets in *Madison Teachers*). Contrary to what the Police Association contended at oral argument, however, the uniformity requirement does not simply mean that a legislative enactment "applying" to all municipalities passes the test. The language used in the state constitution is "affects," not "applies," indicating that a more substantive analysis is required. *See id.* (using "affects"); *Van*

*Gilder*, 222 Wis. at 80 ("If the state legislation *affects* only classes of cities, it is subordinate to the city legislation . . . .") (emphasis added); *Kalal*, 271 Wis. 2d 633, ¶ 44. Thus, " 'enactments of the legislature which do not affect all cities uniformly are to be subordinate to legislation of cities within their constitutional field.' " *Van Gilder*, 222 Wis. at 80 (citation omitted). " 'If the state legislation affects only classes of cities, it is subordinate to the city legislation in the city which has so legislated, but it is still in force and effect for the government of cities which have not acted under their home rule powers.' " *Id.* (citation omitted).

¶ 19.  With the proper standards in mind, we now turn to the matter of whether Wis. Stat. § 66.0502 involves a matter of statewide concern, and whether it uniformly affects every Wisconsin city or village.

*(1)  Wisconsin Stat. § 66.0502 does not involve a matter of statewide concern.*

■■

¶ 20.  We begin our analysis by summarizing the arguments supporting the Police Association's position that Wis. Stat. § 66.0502 involves a matter of statewide concern. The primary reason advanced by the Police Association, both in the briefs and at oral argument, is that the statute involves a matter of statewide concern because the legislature said so. *See* Wis. Stat. § 66.0502(1). Similarly, the trial court determined that the legislature has an interest in "maintaining uniform regulations on residency requirements." The Police Association also argues that the statute involves the legislature's authority to regulate employment "where it relates to matters of public safety and welfare." Additionally, the trial court also determined

that the statute addressed the statewide interests of "protecting public employees against unfairly restrictive employment conditions" and "statewide regulation of police and fire protection." In this same vein, the trial court also found that the plain language of § 66.0502 "creates an enforceable liberty interest for public employees to be free from residency requirements as a condition of employment." For the reasons that follow, we find none of these arguments persuasive.

■■

¶ 21.  The argument that residency requirements are a matter of statewide concern simply because the legislature said so is not persuasive because it is unsubstantiated. Neither the Police Association nor the trial court point to any facts supporting this claim; the Police Association merely argues on appeal that the legislature can do what it wants. We disagree. While we generally give the legislature's determinations great weight "because matters of public policy are primarily for the legislature," such pronouncements are not controlling, and it is the judiciary that has been charged with the ultimate determination of what is a matter of statewide concern. *See Van Gilder*, 222 Wis. at 73–74. Moreover, even when this court reviews matters under an extremely deferential standard, we still require the decisions we review to be supported by *some* reasoning. *Cf. Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). In this case, we cannot conclude that "because the legislature said so" is reason enough to affirm the trial court when there are no facts to support such a conclusion. The facts in the record, exemplified by the Legislative Fiscal Bureau paper, make clear that the goal of WIS. STAT. § 66.0502 was to target the City of Milwaukee. Nearly every

portion of the Legislative Fiscal Bureau paper's analysis explains in great detail how *Milwaukee* will be affected. The effect on the state, on the other hand, is never substantiated, and only given lip-service with broad policy arguments. This complete dearth of evidence to support the legislature's contention does not suffice under the law. Because the legislature's claim that residency requirements are a matter of statewide concern, *see* § 66.0502(1), is unsubstantiated, it does not influence our decision.

¶ 22. The argument that Wis. Stat. § 66.0502 concerns a statewide matter because it involves the legislature's authority to regulate employment "where it relates to matters of public safety and welfare" is similarly unpersuasive. In supporting this contention, the Police Association cites a number of examples in which the legislature has regulated employment for public safety and/or welfare, including: prohibiting employers from using HIV testing as a condition of employment, *see* Wis. Stat. § 103.15; prohibiting employers from mandating unsafe working hours, *see* Wis. Stat. § 103.02; prohibiting "honesty" testing as a condition of employment, *see* Wis. Stat. § 111.37; prohibiting adverse consequences for employees who undergo genetic testing, *see* Wis. Stat. § 111.372; and requiring uniform training for law enforcement professionals (Wis. Stat. § 165.85), firefighters (Wis. Stat. § 38.04(9)), and teachers (§ 38.04(4)). The problem with the Police Association's argument, however, is that no evidence in the record allows us to conclude that § 66.0502 was drafted with the public's health, safety, or welfare in mind.[5] The

---

[5] Indeed, urban policy research has found that having residency requirements for police officers is correlated to higher clearance rates for crime, particularly for "lesser" crimes. *See* Dennis C. Smith, *Police Attitudes and Perfor-*

parties pointed to no such proof either in their briefs or at oral argument. Instead, the sole reason we can delineate for the statute's existence is the gutting of Milwaukee's long-standing residency requirement. We cannot conclude that such a measure involves the health, safety, or welfare of the people of Wisconsin in any demonstrable way.

¶ 23. Likewise, we are not persuaded that WIS. STAT. § 66.0502 concerns a statewide matter because the legislature has broad authority to regulate police officers and firefighters. The statute regulates more than just police officers and firefighters; it concerns *all* public employees. Also, the legislation at issue does not pertain to any specific training that public employees must complete in order to do their jobs properly. Rather, the legislation affects only whether local governments can require those employees to live in the communities they serve.

¶ 24. Furthermore, the trial court's determination that the statute evinces the legislature's statewide interest in "protecting public employees against unfairly restrictive employment conditions" does not persuade us because it is contrary to law. It is well known that residency restrictions imposed upon municipal employees as a continuing condition of their public employment have been upheld by numerous courts. Such residency restrictions have been held to be rationally related to legitimate governmental purposes. *See e.g., McCarthy v. Philadelphia Civil Serv. Comm'n,* 424 U.S. 645, 645–46 (1976) (per curiam); *Detroit Police Officers Ass'n v. City of Detroit,* 190 N.W.2d 97, 97–98 (Mich. 1971), *appeal dismissed for lack of substantial federal question,* 405 U.S. 950 (1972); *Mogle v. Sevier*

mance, *The Impact of Residency,* URBAN AFFAIRS QUARTERLY, Vol. 15 No. 3., 317, 323, 326, 330 (March 1980).

*Cnty. Sch. Dist.*, 540 F.2d 478, 483–84 (10th Cir. 1976); *Wardwell v. Board of Ed. of City Sch. Dist.*, 529 F.2d 625, 628 (6th Cir. 1976); *Wright v. City of Jackson, Mississippi*, 506 F.2d 900, 901–02 (5th Cir. 1975); *Miller v. Krawczyk*, 414 F. Supp. 998, 1001 (E.D. Wis. 1976); *Pittsburgh Fed. of Teachers v. Aaron*, 417 F. Supp. 94, 97 (W.D. Penn. 1976); *Conway v. City of Kenosha*, 409 F. Supp. 344, 350 (E.D. Wis. 1975). Because residency requirements such as Milwaukee City Ordinance 5–02 have been consistently found to be constitutional, we fail to see how the statute prohibiting residency requirements protects employees against "unfairly restrictive" conditions. More importantly, there is no evidence in this record supporting this assertion. As the law makes clear, residency requirements are indeed "restrictions," but they are in no way "unfair." We further conclude, for this same reason, that the trial court erred in declaring that Wis. Stat. § 66.0502 creates a protectable liberty interest.

¶ 25. In sum, we are left with no convincing reason to conclude that Wis. Stat. § 66.0502 truly involves a matter of statewide concern.

¶ 26. This leaves us to consider the arguments the City sets forth in support of its argument that Wis. Stat. § 66.0502 concerns a local matter: the right of a municipality to establish and enforce residency requirements. The City argues that local residency requirements primarily affect municipalities'—not the state's—bottom lines, and that municipalities should have the ability to determine how their local tax dollars are spent. The City also argues that requiring municipal workers—including firefighters, police, and emergency responders—to live within the city limits ensures they will be able to respond to emergencies quickly, which is primarily a local concern. The City

also argues that there is real value in requiring city employees to make their homes in the community in which they work. For the reasons that follow, we find all of these arguments persuasive.

¶ 27.  First, there is no doubt that, by doing away with City of Milwaukee's residency requirement, WIS. STAT. § 66.0502 directly affects the City's economy and tax base, which numerous courts have recognized is a matter of local concern. *See Van Gilder*, 222 Wis. at 81–82 (" 'There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only . . . . Most important of all perhaps is the control of the locality over payments from the local purse.' ") (citation omitted); *Beardsley v. City of Darlington*, 14 Wis. 2d 369, 373, 111 N.W.2d 184 (1961) (city can decide how to spend taxpayer money); *City of Beloit v. Kallas*, 76 Wis. 2d 61, 66–67, 250 N.W.2d 342 (1977) (there are "matters of purely local concern relating to the tax base"); *Thompson v. Kenosha Cnty.*, 64 Wis. 2d 673, 684, 221 N.W.2d 845 (1974) ("Local governments obviously have a significant interest in the subject [of property tax assessment] since property taxes raise a substantial portion of the revenues."). As Mayor Barrett explained in an affidavit to the trial court, "City residents wish to see their tax dollars used to employ fellow City residents," and "the repeal of the City's residency requirement will have a substantial negative effect on the City's tax base, the preservation of which is a matter of local affairs and government." The Legislative Fiscal Bureau paper reports that abolishing Milwaukee's residency requirement will undoubtedly result in an exodus of higher-income residents, which will in turn lower home values and decrease the tax base. Other documents in the record support the Legislative Fiscal Bureau paper. For example, an October 2013

report titled "Economic Impact of Rescinding the City of Milwaukee's Employee Residency Requirements," created by Chicago-based real estate and development advisory firm SB Friedman, states that the annual average income of City of Milwaukee employees is approximately $16,000 higher than the annual average income of other employed city residents. It also states that the average home value for a City employee's house is approximately $116,000, whereas the average home value of houses owned by all Milwaukee residents is approximately $88,000. The imminent decimation of the tax base and neighborhood make-up of the largest city in our state should concern every Wisconsin citizen, but the issue is most acutely a local one. In this regard, § 66.0502 involves a matter of local concern.

¶ 28. Second, Wis. Stat. § 66.0502 undoubtedly interferes with the ability of many municipalities—including the City of Milwaukee—to promptly respond to emergencies. Of course, both state and local governments have an interest in ensuring that all emergencies in the state are addressed. But § 66.0502 primarily affects how local governments can respond. This is especially true in a city the size of Milwaukee, which encompasses more than ninety-six square miles. As Mayor Barrett explained, allowing city employees to live outside the city results in slower service times:

> [S]now emergencies negatively affect response times not only for public safety personnel, but also for snow plow drivers, burst water main crews, and sewer workers. In the event of an impending large snow emergency, the City [of Milwaukee] permits employees to take home snow plowing equipment so that they can reach their appointed routes as quickly as possible. A snowed-in driver at a distant suburban home is of no use in a snow emergency.

649

Indeed, the fifteen-mile rule set by § 66.0502(4)(b)-(c), which allows local governments to impose requirements that employees live within fifteen miles of the city or county that employs them, implicitly recognizes that citizens are safer and better served when emergency responders live nearby. As such, the fifteen-mile rule only strengthens our conclusion that local governments have a strong interest in having their employees work in the communities they serve. Furthermore, as we see from our review of Milwaukee Police Department Rule 4–025.00, Milwaukee Police, are essentially always "on duty":

> Members of the police force . . . are always subject to orders from proper authority and to call[s] from civilians. The fact that they may be technically "off duty" shall not be held as relieving them from the responsibility of taking required police action in any matter coming to their attention at any time.

Thus, for all of the foregoing reasons, we agree with the City that its "interest in the efficient delivery of City services to its residents is a . . . matter of local affairs that is advanced by the requirement that City employees live in the City they serve."

¶ 29. Third, by abolishing local residency requirements, WIS. STAT. § 66.0502 directly affects the City's strong interest in having employees who are genuinely invested in the City's welfare and progress. As the Common Council explained in its July 2, 2013 resolution, "[h]aving police, fire department, health, water utilities, neighborhood services and City development personnel, among other employees, live in the City provides them with better knowledge of the challenges facing the City, increased understanding of the neighborhoods and enhanced relationships with resi-

650

dents."[6] Likewise, Mayor Barrett attested that "City employees who live in the City have a stake in the common enterprise of municipal government and thus City employees are more attentive, compassionate and diligent in providing services to City residents." Similarly, City of Milwaukee Police Chief Edward Flynn explained, in his October 31, 2013 affidavit to the trial court, that having police officers who are City residents is not only critical to the police force's legitimacy and perceived integrity, but also good for work-life balance, does not pose a recruitment problem, and allows off-duty officers to respond to emergencies in the community:

> I have worked in jurisdictions that have no residency requirements and in jurisdictions like the City of Milwaukee where residency requirements provide that City employees live within the City.
>
> Residency requirements play an important role in policing urban jurisdictions such as Milwaukee because officers' residency in the community that they police creates a visceral and instinctive connection

---

[6] Independent research supports the Common Council's resolution. Smith noted: "James Q. Wilson has observed that when most officers do not reside in the city they lack knowledge of and ties to the community." *See* Smith, *supra,* note 4, at 320. Smith also observed: "Studies of urban police personnel have repeatedly found a much higher proportion of whites on the force than in the community. The potential for controversy over the underrepresentation of minorities in police departments is heightened when a majority of the white officers do not live in the community." *Id.* In addition, Stephen F. Coleman found: "[O]fficers who live in the community want to be liked and respected by their civilian friends and neighbors. They do not want to get a bad reputation. Therefore, they try to stay away from unsavory activities like police brutality." Stephen F. Coleman, *The Dilemmas of Police Residency: Views from the Street,* JOURNAL OF POLICE SCIENCE AND ADMINISTRATION, Vol. 11, No. 2 194, 196–98 (1983).

among the officers and community residents that cannot be created by other means.

In my opinion, it is important to residents of the City of Milwaukee . . . to know they are dealing with police officers who understand their circumstances and are committed to their community.

Public support for the police department is in part based on the fact that police officers live in the community they police . . . . The residents see our officers as neighbors, Little League coaches, and church volunteers. They see the officers as members of the community raising families, not just authority figures.

We have an ongoing struggle, as every urban police department does, to maintain our credibility in the community we police. The residency requirement helps to prevent the perception . . . that officers are outsiders, without any empathy for those they are policing, because [they] invade residents' neighborhoods and later return to distant retreats . . . .

If Milwaukee cannot maintain its residency requirement . . . the bonds of trust and legitimacy with the people who are being policed will be damaged.

Police officers who live in the community they police have an increased motivation to maintain a safe environment for themselves, their families, their co-officers, and the community as a whole.

. . . [P]olice officers are human and their conduct is affected by child care and commuting time needs. In my experience, in communities where residency requirements have been eliminated, those needs created a negative impact on the decisions officers made at work, particularly at the end of their shifts.

The City of Milwaukee has not suffered from a lack of candidates for police positions. The department recruits nationwide and police candidates know that they are expected to live in the City . . . .

> Off-duty police officers come to the aid of Milwaukee residents frequently every year.
>
> Police officers who do not live in the City of Milwaukee will not be able to respond while off-duty to the calls of City of Milwaukee residents in need of police assistance.

(Paragraph numbering omitted.)

¶ 30. In sum, as the foregoing discussion demonstrates, WIS. STAT. § 66.0502 does not involve a matter of statewide concern. We must therefore now consider whether it uniformly affects every city and village. *See Madison Teachers*, 358 Wis. 2d 1, ¶ 101.

*(2) WISCONSIN STAT. § 66.0502 does not uniformly affect every city or village.*

■

¶ 31. Turning to the uniformity requirement, we again note that the Police Association argues that the uniformity requirement is an extremely low hurdle for competing state legislation to clear. The Police Association's primary argument is that WIS. STAT. § 66.0502 is uniform because it "applies" to all local governmental bodies in the state. According to counsel at oral argument, the only sort of state legislation that would not uniformly affect all cities or villages is one that would overtly single out a particular municipality.

¶ 32. We disagree. The Police Association's reading of the uniformity requirement would all but obliterate the home rule amendment, which is not only illogical but also contrary to law. As we have seen, the law requires that we interpret the home rule amendment with an eye toward preserving the constitution. *See Ekern*, 190 Wis. at 639.

¶ 33. There is no dispute that, while the statute does not overtly single out any particular municipality, it will have an outsize impact on the City of Milwaukee. As detailed more fully in the background portion of this opinion, the Legislative Fiscal Bureau paper makes very clear that the City of Milwaukee would be very severely impacted by legislation prohibiting residency requirements. On the other hand, the impact of a prohibition on residency requirements on the numerous other local governmental bodies in this state is not discussed in any meaningful way. Indeed, the notion that a statute purporting to gut the tax bases and compromise neighborhood integrity of *all* municipalities would pass both houses of the legislature defies logic. Regardless of what the statute's language says, the facts in the record make clear that only one city—Milwaukee—will be deeply and broadly affected. We therefore can reach no other conclusion than that Wis. Stat. § 66.0502 does not uniformly affect every city or village in this state.

¶ 34. In sum, we conclude that Wis. Stat. § 66.0502 does not uniformly affect every city or village. As a result, we conclude that § 66.0502 does not apply to the City of Milwaukee's residency requirement, Milwaukee City Ordinance 5–02. *See Van Gilder*, 222 Wis. at 80.

### (3) Conclusion.

¶ 35. The statute at issue in this case, Wis. Stat. § 66.0502, does not involve a matter of statewide concern, nor does it affect every city or village uniformly; therefore, it does not, pursuant to the home rule amendment, Wis. Const. art. XI, § 3.(1), trump the City of Milwaukee's residency requirement. Consequently, we reverse the trial court's decision that

Milwaukee Ordinance 5–02 is unenforceable, and conclude that the City ordinance is still good law; and we conclude that § 66.0502 does not apply to the City of Milwaukee. We also conclude that § 66.0502 does not create a protectable liberty interest, and therefore reverse the trial court's decision to the contrary and affirm the part of the trial court's decision declaring that the City's did not deprive any Police Association members of their constitutional rights.

*By the Court.*—Judgment affirmed in part; reversed in part.

¶ 36. KESSLER, J. (*concurring*).    I agree with the entirety of the Majority opinion. I write separately to point out from the record some additional fiscal effects WIS. STAT. § 66.0502 will likely have on the City of Milwaukee, and only on the City of Milwaukee, showing this statute is only of *local* concern.

¶ 37.    When considering the passage of WIS. STAT. § 66.0502, the legislature's own research group, the Legislative Fiscal Bureau, prepared a report highlighting the likely impact elimination of municipal residency requirements would have. Only one city was focused on—Milwaukee. No other Wisconsin city was shown by the Bureau report to be impacted. The clear implication is that the impact was local to Milwaukee only.

¶ 38.    According to the Bureau report, the City of Milwaukee and the Milwaukee Public School System (MPS) are two of the State's largest municipal employers. Both are units of local government.[1] Both share identical geographic boundaries. According to the Bureau, the City was one of only thirteen municipalities

---

[1] *See* WIS. STAT. § 115.01(3) and WIS. STAT. ch. 62.

in Wisconsin that required all of their employees to live within municipal boundaries, and MPS was the only school district of which it was aware that required all employees to live within its district boundaries.

¶ 39. A report in the record by the consulting firm SB Friedman (Friedman)[2] analyzed the actual impact of prohibiting employee residency requirements on cities of similar size to Milwaukee. Friedman reported that the percentage of city employees who lived outside of the city stabilized about eleven years after the residency requirement was removed. In Detroit, the percentage of non-residents stabilized at forty-five percent of the employees; the percentage of non-resident employees stabilized at sixty percent in Baltimore. Friedman predicted that sixty percent of Milwaukee employees would become non-residents. There is no evidence in the record of any other Wisconsin municipality that will be similarly affected by an exodus of its employees.

¶ 40. Friedman calculated the average annual retail purchases per household of retail goods, food and beverages from stores in the City of Milwaukee. The average household spending for such goods was $13,899. Friedman projected that 3940 households would leave Milwaukee without being replaced by in-migration from other municipalities. These projections are not refuted in the record. The loss of those households would result in an estimated loss to retail businesses in Milwaukee of $54,722,660, solely because of WIS. STAT. § 66.0502. There is no evidence in the record that any other Wisconsin municipality would likely be similarly affected.

---

[2] The report was a part of the City of Milwaukee's submissions in support of its motion for summary judgment. It is a part of the record before us.

¶ 41. Milwaukee employs over 7000 people, approximately fifty percent of whom are police officers or firefighters.[3] According to Milwaukee Mayor Tom Barrett's October 30, 2010 affidavit, $366.8 million of Milwaukee's budget is spent on salaries and wages. Barrett further indicates that fifty percent of Milwaukee's *total operating costs* go towards salaries for police officers and firefighters.

¶ 42. Friedman identifies the average annual income of Milwaukee employees as $54,703. Friedman projects the outflow of the high-income Milwaukee employees will cause a reduction in the tax base of $622 million in residential land values and $27 million in retail property values. A loss of $649 million from the Milwaukee tax base will obviously directly impact Milwaukee's ability to pay for necessary infrastructure, services and wages. There is no evidence in the record that any other municipality would likely be similarly affected.

¶ 43. If Friedman's prediction of a sixty percent loss of Milwaukee's employee residents comes to pass, Milwaukee will be paying non-resident employees approximately $229,752,600[4] annually as a direct result of Wis. Stat. § 66.0502. There is no evidence in the record that any other Wisconsin municipality would likely be similarly affected.

¶ 44. I am authorized to state that Judge Kitty Brennan joins this concurrence.

■

---

[3] This statistic is taken from the affidavit of City of Milwaukee Mayor Tom Barrett and is in the record before us. The figures have not been disputed in the record.

[4] Sixty percent x 7000 employees = 4200; 4200 employees x $54,703 (average wage) = $229,752,600.